J-S72032-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| FREDERICK FLOECK | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRENDA LEE FLOECK | : | No. 1505 EDA 2017 |

Appeal from the Order May 1, 2017
In the Court of Common Pleas of Chester County Domestic Relations at
No(s):  No. 11-09083

BEFORE:   BENDER, P.J.E., MUSMANNO, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.: **FILED NOVEMBER 30, 2017**

Frederick Floeck ("Husband") appeals from the May 1, 2017, order entered in the Court of Common Pleas of Chester County, Domestic Relations, denying his Petition to Terminate Alimony.[1]  After a careful review, we affirm.

The trial court has exhaustively set forth the facts and procedural history underlying this appeal as follows:

> Husband and Wife were married on September 18, 1983. They separated in July of 2011 and [a final decree in divorce was entered] on August 11, 2015. Husband is 68-years-old.  His employment background is in sales management.  He worked for Mid-Atlantic Medical where he increased growth from $800,000 to $5 million in two years.  N.T. 11/29/16 at 79-80.

---

[1] In addition to denying Husband's Petition to Terminate Alimony, the trial court's May 1, 2017, order granted Brenda Lee Floeck's ("Wife") petition for contempt and counsel fees.  On appeal, Husband indicates that he is not challenging this portion of the trial court's order.  **See** Husband's Brief at 9.

---

*   Former Justice specially assigned to the Superior Court.

In 1994, Husband started his own company, Patient Care Systems, later renamed Ergo Sciences, then renamed Ergo Midwest. *Id.* at 13. Ergo Midwest ("Ergo") provides medical equipment for rent to nursing homes and hospitals in the Midwest. The equipment includes beds, wheelchairs, lifts, commodes, mattresses, and pressure wound therapy devices. *Id.* at 14, 17. Ergo has distribution centers in St. Louis and Kansas City. *Id.* at 15. Husband operated the business from his Pennsylvania home and traveled to St. Louis and Kansas City once every two weeks.

Regarding the parties' divorce, an Arbitration Award[2] dated May 26, 2015, was incorporated, but not merged, into the August 11, 2015, Decree in Divorcee [*sic*]. Pursuant to the Arbitration Award, Husband is required to pay $7000 per month in alimony until the death of either party, Wife's marriage/cohabitation, or May 1, 2022.

Of particular relevance to these proceedings, the Arbitration Award stated that alimony shall not be subject to modification, except in the event of Husband's medical disability or a decrease in Husband's gross annual earned income as a result of circumstances beyond his control in excess of twenty-five percent (25%) of Husband's gross annual earned income for calendar year 2013.

On May 3, 2016, Husband filed a Petition to Terminate Alimony.[3] He claimed that he sold Ergo on May 2, 2016, and since the sale of the business, he receives no earned income.[4] Husband testified that[,] in 2015, the company struggled financially, specifically with cash flow problems. Husband testified that Ergo had cash flow issues in 2013, 2014[,] and 2015. *Id.* at 17. He stated that the cost to provide health insurance for his employees increased. *Id.* at 18.

_____

[2] The parties executed an agreement to arbitrate the economic claims pertaining to their divorce, and on May 26, 2015, the arbitrator entered his conclusions/award with regard thereto.

[3] Thereafter, upon Husband's failure to pay alimony, on July 8, 2016, Wife filed a petition for contempt and counsel fees. Further, on August 26, 2016, she filed a petition for special relief for counsel fees under 42 Pa.C.S.A. § 2503.

[4] Husband receives Social Security payments.

Ergo had fifteen employees. Husband testified that his insurance rates increased when some of his employees filed for Workers' Compensation benefits. *Id.* at 75. [Specifically, he testified that] "[o]ur health insurance increased 43 percent in two years, and our Workmen's Comp went up, I think 25 percent in one year." *Id.* at 76.

Husband testified that Ergo spent a lot of money getting into the hospice market. *Id.* at 29. Husband stated that, in 2014 and 2015, some manufacturers of medical equipment sold directly to Ergo's customers, eliminating the need to rent the equipment. *Id.* at 30. Husband stated that the sales/gross revenue of Ergo increased between 2014 [to] 2016 because the company rented negative pressure wound therapy devices. *Id.* at 137. The pumps rented for $40 per day. [Husband testified] "that was our highest revenue per diem equipment type." *Id.* at 27. The company had to buy more equipment as the sales increased, which increased the debt. *Id.* at 152-53. Husband stated that his employees' salaries also increased. *Id.* at 153-54.

Jennifer Gallagher began working in Husband's business as a receptionist seventeen years ago and advanced to the position of office manager. *Id.* at 200.[5] Ms. Gallagher was responsible for overseeing the day-to-day operation of the business, including accounts payables and accounts receivables, supervising the drivers, and placing orders for equipment and repair parts. *Id.* at 201. Ms. Gallagher and Husband spoke daily by telephone and they corresponded daily via email. Husband also traveled to the office in Missouri a couple of times a month. *Id.* at 202.

Ms. Gallagher testified that, in 2014, Ergo [ ] experienced increasing expenses. [She specifically testified that] "[t]he cost of fuel and healthcare, cost to maintain our medical equipment, all of those things had increased cost. So, you know, we were having a tough time. We had a lot of customers that paid slowly or did not pay, and we would have to chase after them. So it was a good juggle to keep things going." *Id.* at 202-03. [She further testified that] "[w]e were always trying to expand the business. He was always pushing to drive the sales team. There were some opportunities that we had hoped to take advantage of going back into the hospice foray for one of our customers, for the HSI Group,

---

[5] Ms. Gallagher works for the current owners of Ergo in the same capacity as office manager.

providing hospice for them and their nursing home and hospice services." *Id.* at 205.

Ms. Gallagher stated that, in 2015, some suppliers and vendors threatened legal action against Ergo. Health insurance increased and workers' compensation insurance increased. *Id.* at 206. [She testified that] "[w]e had an employee at one of our sites who was injured…it drove our [insurance] policy up." *Id.* at 207. She stated that the cost of fuel and equipment increased. *Id.* [She indicated that] "[i]t was very difficult and we were having a problem making payroll. And there were times when we had to defer direct deposits and issue employees paper checks instead because we simply did not have the funds in place at the time that they needed to be in place for the direct deposits into the employee accounts." *Id.* at 207-08.

Ms. Gallagher stated that vendors wanted to be paid within 30 days but the average time to collect accounts receivables was 75 to 100 days. When Ergo failed to pay vendors within 30 days, some vendors refused to provide additional supplies and [Ms. Gallagher testified that] "one or two vendors took legal action against us." *Id.* at 209. Ms. Gallagher testified that at times Husband deposited his personal funds into the company "because we were not able to run independently on what we were making." *Id.* at 219.

Tony Coladonato, C.P.A., provided business and personal accounting services to Husband. He testified that Husband put his own funds into the company in 2013, 2014, and 2015. He stated that Husband would have to put money back into the company at the end of the year, sometimes to buy more equipment, sometimes to make payroll.

Since 2005, Husband borrowed from Penn Liberty Bank, receiving business loans and lines of credit. The loans were secured by business assets and marketable securities. *Id.* at 163. Husband testified that, after the divorce in 2015, he had no equity to borrow for the business. [He testified that] "[w]ith the alimony allocation of [$]7,000 a month, which was hurting our cash flow even more and the continued decline of our revenue stream, I was no longer able to effectively borrow from the bank for these equipment types, and our drive to build the business was being stymied by that." *Id.* at 20. Husband stated that Penn Liberty, his only lender since 2005, would not approve a loan without the joint assets as collateral. *Id.* at 21-22. [He indicated] "I didn't have the relationship with any other bank. I had always gone to

Penn Liberty…But I had no assets to borrow against. Everything was pledged to Penn Liberty." *Id.* at 24. Mr. Coladonato testified that, in 2016, Penn Liberty denied Husband's request for a $50,000 line of credit. He was given a $15,000 loan in March 2016, nonetheless.

James Danna was the manager of commercial industrial lending at Penn Liberty (now WSFS Bank) when Husband requested loans from 2009 to 2016. Mr. Danna testified that Penn Liberty gave Husband two business loans, a line of credit, and a personal loan. Husband received new loans after he paid in full the outstanding loans. *Id.* at 162. In 2016, Husband requested a loan of $50,000 to $75,000. Mr. Danna told Husband that Penn Liberty was not willing to give Husband a loan of that amount based on the financial condition of Ergo. He stated that Husband didn't have the liquid assets he had prior to the divorce, and Husband had a credit score under 600. *Id.* at 164-65. Husband testified the reason for the low credit score was because he had been a victim of identity theft.

Husband testified that, on February 11, 2016, he made an offer to Health Systems, Inc. ("HSI") to provide rental equipment for HSI's twenty-three nursing homes in Springfield, Missouri. *Id.* at 36-38. [Husband indicated] "I was going to have to have at least another 200 to $300,000 available to provide this equipment." *Id.* at 39. Husband stated that HSI rejected Ergo['s] offer to provide equipment; instead, HSI offered to buy the company. *Id.* at 41.

[Husband testified that] "[n]ursing home chains don't buy the distributors that provide equipment to them. It just isn't done." *Id.* [Further,] "[t]hat [this] very large, very wealthy nursing home chain would buy a distributorship, keep all my employees, I could pay my debt down and come out of it with some money, not to worry about making payroll anymore, which was becoming more and more difficult." *Id.* at 149. [He indicated] "it was a complete surprise to see that this nursing chain would want to buy their distributor or a distributor." *Id.* at 152.

Husband stated that he had prior offers to sell the business. In 2013, Freedom Medical offered to purchase Ergo [ ] for 1.2 million. *Id.* at 32. Husband stated that it wasn't a good deal. In 2014, Freedom Medical offered $900,000 for the inventory. Husband stated that he was not actively seeking to sell the business. *Id.* at 33. [He indicated that] "then came this possible

terrific deal to gain 23 nursing homes in the greater Springfield area through HSI, which is the largest nursing home chain in Missouri." *Id.* at 20-21.

HSI purchased the business and retained his employees. Husband testified that HSI was his biggest customer, and without the sale to HSI, his business would experience a 25% [to] 30% loss of revenue (loss of HSI's business). *Id.* at 34, 42. [Husband stated that] "[t]o lose HSI, I would have had to reduce staff for sure." *Id.* at 43. [Further, he indicated] "[o]ur revenues would have reduced by 30 percent, at least." *Id.* at 44. Husband stated that at the time that he accepted the offer in February of 2016 he was not trying to sell the business. He was trying to grow it. *Id.* at 41.

Husband denied that he sold the business to avoid paying alimony. *Id.* at 44, 78. He stated that he sold [the business] because he was afraid that he would lose HSI as a customer, and he was pleased that HSI retained all of his employees. *Id.* at 47. Husband offered to stay on with Ergo for a time after the sale. He was not retained as an employee or as an independent contractor. *Id.* at 45-46.

Systems Leasing, owner of HSI, bought Ergo [ ] on May 2, 2016[,] for 1.3 million plus $220,000 accounts receivable. The total sales price was 1.52 million. *Id.* at 46-47. Husband netted about $600,000 from the sale of Ergo ($1,500,000- $300,000 accounts payable- $500,000 payment to Penn Liberty- $70,000 payment of credit card debt- $39,000 payment of legal fees). [Husband stated] "[w]hen I sold the business, Penn Liberty got $500,000 to pay off the debts." *Id.* at 99. [Further] "I was given a final debt load by Penn Liberty of $500,000…and any and all of the proceeds from the sale, [$]1.3 million plus the accounts receivables, minus that [$]500,000, minus the $300,000 for accounts payable, that's what—that's what I retained; approximately $600,000." *Id.* at 100-01.

Although Husband stated that he was compelled to sell the business, the evidence shows that the sales of the business increased in 2013, 2014, and 2015. Husband testified that, in 2015, Ergo had gross revenue of over $1.7 million. *Id.* at 81. Mr. Coladonato testified that the total sales increased from $1,547,000 in 2013, to $1,783,684 in 2015. He stated that the costs of goods sold also increased: $690,000 in 2013; $770,000 in 2014; and $900,000 in 2015. Mr. Coladonato prepared the corporate tax return for 2015 using the GAAT accounting method.

He stated that if he added back the depreciation into the income of the company, it would have offset any loss, resulting in net income for the company in 2015.

Wife called as her expert James B. Griffin, Esquire, C.P.A., who reviewed the Ergo [ ] financials for 2009 to 2016. [Mr. Griffin] stated that sales continued to grow from 2013 to 2015, and Ergo had its best year in sales in 2015. Mr. Griffin stated that buying equipment and hiring additional employees to maintain the equipment is part of funding growth to get sales. [Mr. Griffin testified that] "[a]s businesses grow they need to provide and purchase equipment and have employees to install and sell the product." Mr. Griffin agreed that Ergo's expenses increased as the sales increased. He stated that the growth gets funded by bank loans, owner finances, factoring accounts, and investors.

Husband stated that one of the reasons he sold the company was because Penn Liberty denied him further loans to keep the company afloat in 2016. In March of 2015, Husband secured a $100,000 loan for Ergo from Penn Liberty. On March 21, 2016, Penn Liberty loaned Husband $15,000. *Id.* at 112. He wanted a loan of at least $50,000.

Husband had a personal Merrill Lynch account with a value of $156,309.82 as of October 31, 2016. *Id.* at 121-22. Husband testified that he believed the value of the Merrill Lynch account was $50,000. *Id.* at 70. He did not offer the funds in the account to Penn Liberty as collateral when he asked for the $50,000 loan.

Mr. Danna testified that Husband did not tell him about the personal funds he had in the Merrill Lynch account. Mr. Danna stated that if he had known that there was $156,000 in another investment account, he might have approved a loan. *Id.* at 177. [He indicated] "[t]hat would have helped." *Id.* at 176. [He specifically asserted that] "[i]t would have helped him very much. And I asked him several times if he had more." *Id.* Mr. Danna testified that had he known about Husband's $156,000 Merrill Lynch funds, he "probably" would have approved a $75,000 loan. *Id.* at 179. Mr. Coladonato testified at the March 1, 2017, hearing that he recently became aware of the $156,000 funds in the Merrill Lynch account.

Mr. Griffin testified that the net income of Ergo would have been positive if accrual basis accounting had been presented to Penn Liberty when Husband requested another loan. He stated the accrual method of accounting would show how the billings of the bank were growing. An accrual statement would have shown

greater net income because depreciation would be much slower over longer time. The financial picture would have been more positive.

Mr. Griffin believed Husband would have qualified for a loan from the Small Business Administration ("SBA") if Ergo's accounting used accrual based financial statements as an alternative to using the $156,000 account as collateral. The inventory could be used as collateral. Husband had a previous offer to sell the inventory for $900,000. The SBA allows a longer payment schedule. Husband never applied for a loan at any other bank, and he never applied for a SBA loan. *Id.* at 83-84.

Mr. Griffin believed that Husband could have secured funding from another bank. He stated that it is common today for a business owner to go to more than one bank for funding. For a business loan, Husband's guarantee would be required, and he would have to explain the identity theft that lowered his credit score. Mr. Griffin stated that the bank would look at the relationship Husband had with prior loans. He always paid; that would outweigh the bad credit score. Mr. Griffin is chairman of the board of First Resource Bank in Exton and West Chester. He sits on a loan committee.

Husband testified that he would have lost HSI's business if he did not sell Ergo to HSI. *Id.* at 84. In argument, his counsel described HSI's offer to buy Ergo as a "hostile takeover in which Husband had no control." Wife argued that Husband voluntarily chose not to seek additional funding for the business, but instead voluntarily chose to sell the business.

Trial Court Opinion, filed 5/1/17, at 1-11 (footnotes in original) (footnote omitted and footnotes added).

By order entered on May 1, 2017, the trial court denied Husband's Petition to Terminate Alimony. Further, the trial court granted Wife's petition for contempt and request for counsel fees, thereby directing Husband to pay Wife $15,418.00 in counsel fees. Husband filed this timely notice of appeal, and all Pa.R.A.P. 1925 requirements have been met.

On appeal, Husband sets forth the following issues in his Statement of Questions Involved:

1. Did the trial court err in denying Husband's Petition to Terminate Alimony?

2. Did the trial court err in ordering Husband to pay Wife the sum of $77,000 representing monthly alimony payments from May 2016 to March 2017?

3. Did the trial court err in its determination that Husband had options to continue to operate his business, Ergo, that he chose not to pursue?

4. Did the trial court err in its determination that Husband had the option of seeking a loan at another bank?

5. Did the trial court err in its determination that Husband had the option of attempting to continue to grow his business, Ergo?

6. Did the trial court err in its determination that Husband chose to sell his business, Ergo, and chose to stop performing his contractual obligation to pay Wife alimony?

7. Did the trial court err in its determination that Husband was not forced to sell his business, Ergo?

8. Did the trial court err in its determination that it was Husband's choice to sell the business and not a circumstance beyond his control?

9. Did the trial court err in its determination that there was no evidence that HSI would have withdrawn its current business from Ergo if Husband turned down the sale offer?

10. Did the trial court err in its determination that the parties could have enumerated other conditions terminating alimony if they so choose?

Husband's Brief at 5-6.

Despite setting forth ten separate issues, Husband indicates on appeal that the overarching issue is his first issue, namely, whether the trial court erred in denying Husband's Petition to Terminate Alimony. *Id.* at 12. In this vein, Husband's appellate brief contains a single argument section, indicating

that all of his issues may be addressed under the umbrella of his first issue. *Id.*

A close examination of Husband's appellate argument reveals that Husband contends he presented competent evidence demonstrating a change of circumstances as it related to his gross annual earned income, and thus, the trial court abused its discretion in denying his Petition to Terminate Alimony. Specifically, he argues he presented competent evidence that his sale of Ergo was involuntary and constituted a "substantial change of circumstances beyond the control of [Husband]." Husband's Brief at 10. He claims that the evidence reveals he "was faced with a hostile takeover of his business, Ergo, requiring him to sell the business or risk the loss of significant sales from his customer, HSI, [which was] ultimately the purchaser of Ergo[.]" *Id.* at 10, 13. Further, he argues the evidence reveals that he "did not have a choice in selling his business[,]…[he] was not actively seeking to sell the business but was without personal funds to continue the business,…[and he] did not sell his business to avoid his alimony obligation." *Id.* Moreover, he suggests that "the record shows that Husband paid his alimony obligation every month until such time as Ergo [ ] was sold in a hostile bid and he became unemployed without income." *Id.* at 18. Husband argues that "[l]oss of employment may be considered an example of circumstances beyond one's control…[and the competent evidence demonstrates] Husband has suffered a

job loss caused by circumstances beyond his control as set forth above." *Id.* at 19.

Initially, we note that Section 3701(e) of the Divorce Code permits modification and termination of an award for alimony. *See* 23 Pa.C.S.A. § 3701(e). Specifically, the Divorce Code provides that:

> An order entered pursuant to this section is subject to further order of the court upon changed circumstances of either party of a substantial and continuing nature whereupon the order may be modified, suspended, terminated or reinstituted or a new order made. Any further order shall apply only to payments accruing subsequent to the petition for the requested relief. Remarriage of the party receiving alimony shall terminate the award of alimony.

*Id.*

An award of alimony may be terminated by a change in circumstances beyond a party's control; however, it is the burden of the party seeking to terminate an order of alimony to show by competent evidence that a change of circumstances justifies the termination. *Litmans v. Litmans*, 673 A.2d 382, 388 (Pa.Super. 1996).

In reviewing orders granting or denying a request to terminate alimony, our standard of review is limited to considering whether the trial court abused its discretion or committed an error of law. *Simmons v. Simmons*, 723 A.2d 221, 223 (Pa.Super. 1998). While it is not this Court's duty to create the record or assess credibility, we must nevertheless examine the record to determine whether there is competent evidence supporting the trial court's order. *Jayne v. Jayne*, 663 A.2d 169, 176 (Pa.Super. 1995).

- 11 -

In rejecting Husband's claim, the trial court relevantly indicated the following:

> Was Husband forced to sell the business? Was the sale of the business that resulted in a greater than 25% decrease in Husband's gross annual earned income as compared to 2013[6] a circumstance beyond his control?
>
> There was no evidence that Ergo would have lost HSI's business if Husband turned down the offer of sale; there was only Husband's testimony that he *feared* losing HSI's business if he did not sell. On the other hand, we cannot know [whether] Ergo would have survived the cash flow crisis in 2016 because Husband sold the business in May of that year.
>
> It is undisputed that Ergo's accounts receivables continued to grow in 2015 with the addition of pressure wound therapy devices (pumps) to the list of rental medical equipment. In a letter dated March 17, 2016, to Ergo's potential buyer, Mr. Coladonato stated: "As such, during 2015, the monthly billings for Ergo [ ] have been increasing due to various agreements secured during the year, and has resulted in increased monthly sales, as noted with December sales collected to be approximately $148K." [The trial court] credit[ed] the testimony of Ms. Gallagher that the cost of fuel and healthcare increased as well as the cost to maintain the medical equipment. She also stated that the average time to collect accounts receivables was 75 to 100 days, causing problems when Ergo's venders wanted to be paid within 30 days. Despite the rising costs associate[d] with the business, Husband managed to purchase a truck for Ergo for $23,425 in August of 2015, and a second truck for Ergo for $26,025 in November of 2015. As stated, Penn Liberty loaned Husband $100,000 in March of 2015.
>
> Regarding the missed electronic payroll, Ergo paid the employees with paper checks on time. The company never missed making payroll.
>
> Husband had options that he chose not to pursue. He had the option of using the $156,000 funds in his Merrill Lynch [account] as collateral for a loan. He chose not to do that. He

---

[6] Husband received a salary of $100,000 as Ergo's sole officer. N.T. 11/29/16 at 50. Ergo's 2013 Corporate Tax Return shows officer compensation of $126,460.

- 12 -

had the option of seeking a loan at another bank. He chose not to do that. He had the option of attempting to continue to grow the business, as he had done for years. He chose not to do it. Instead, he chose to sell the business and he chose to stop performing his…obligation to pay Wife alimony.

In **Stamerro v. Stamerro**, 889 A.2d 1251 (Pa.Super. 2005), the parties entered into a property settlement agreement whereby the husband paid the wife $1200 per week in alimony. Per the agreement, alimony was non-modifiable unless the husband's income was greater than $600,000 or less than $200,000 in any given year. The husband voluntarily left his employment and filed a petition to reduce alimony payments, claiming he earned less than $200,000. The trial court denied his petition, finding that the husband failed to establish that his income was less than $200,000. The Superior Court affirmed the trial court on the issue of the amount of the husband's income. The Court noted [the] purpose of alimony, and stated: "[T]he parties' contract imposed a duty of good faith to perform contractual obligations diligently and honestly….Husband should not be allowed to evade the spirit or abuse the terms of the agreement by unilaterally and voluntarily reducing his income. To do so would destroy Wife's right to receive the fruits of her bargained-for agreement." **Id.** at 1261-62.

[In the case *sub judice*,] [t]here was nothing in the Arbitration Agreement specifying what would constitute a circumstance beyond Husband's control that would cause his income to be reduced. Certainly there is no mention of the impact on Husband's income if he sold his business. **See McMahon v. McMahon**, 612 A.2d 1360 (Pa.Super. 1992) [(*en banc*)].

[The trial court] find[s] that it was Husband's choice to sell Ergo [ ] to HSI. He was not forced to sell the business; there is no evidence that HSI would have withdrawn its current business from Ergo if Husband turned down the sale offer. It was Husband's choice to sell; not a circumstance beyond his control.

Thus, Husband's Petition to Terminate Alimony is denied.

Trial Court Opinion, filed 5/1/17, at 12-14 (italics and footnote in original)

(citations to record and underline omitted).

We conclude the trial court's order is supported by competent evidence, and the trial court has not abused its discretion or committed an error of law. **See Jayne**, **supra**.  Accordingly, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/30/2017